Before we begin our regular proceedings today, I'm going to do something else and that's that I turn over to Judge Schall to recognize me for a motion. You are recognized Chief. Thank you. Could you stand? Make you stand for a little bit. I move the admission of Jessica Hudak, who is a member of the Bar and is a good standing in the highest courts of California. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. It's kind of caught me by surprise because I forgot that we were swearing Jessica in, but what catches me as a worse surprise is that she's actually leaving. I usually say that these are bittersweet moments for me, but this is just that. I just Jessica has just been a tremendous asset to our chambers and to the court in its entirety. And she's just been a delight for the chambers and the court in its entirety to come here. She made a greater sacrifice than most because she swept her whole family over here, too. And we want to recognize and thank them for that contribution. But her girls are in D.C. public schools and her husband has moved here. The bad news is they're moving back to California. And that's really sad for me. But I just want to express my gratitude to Jessica and her family. And it's been a wonderful ride and I hope you will cherish it because I will. The panel has reviewed all of the supporting papers and affidavits and we're pleased to grant the motion. Thank you. You solemnly swear that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. I do. Congratulations. The first case for argument this morning is 17-19-13. C.S. Nguyen, Vietnam v. United States. Ms. Thorsen, whenever you're ready. Thank you, Your Honor. May it please the court, I'm Maureen Thorsen of Wiley Ryan here today on behalf of the Nguyen Tower Trade Coalition. This is the second time that this action has been before the court and there are only two narrow issues remaining. First, the coalition urges this court to consider further remands to the U.S. Department of Commerce regarding the record evidence used to determine the weight of internal components in C.S. Nguyen's towers. The coalition recognizes that an earlier panel of this court rejected Commerce's explanation for relying on packing list weights and remanded with directions that the margin be recalculated using C.S. Nguyen's reported FOP weights. But this court has also questioned whether directed remands are permissible under the statute authorizing review of Commerce's determinations and has further recognized that directed remands are disfavored generally in federal administrative law because there is nearly always the possibility that the same result will be reached but on different grounds. Wasn't the last round the time for you to make this argument? The last round before this court... Like, I mean, on rehearing, saying... Oh, on rehearing. Yes, well, actually, I mean, either place, but particularly on rehearing, saying the relief went too far, you shouldn't have ordered the adoption of one of the two methods, you should have given the agency a chance to decide whether it had a better reason than it had yet expressed. The coalition believes that that would have been one option for us, but that the appellees, for example, have not cited any cases, anything that would say that's the only way that this issue can come back before this court. And from a practical perspective, the prior panel's decision remanded two aspects of the case, one with a very open-ended instruction to the agency to reconsider. It was not clear what the effect on the margin was really going to be at the time of remand, and my client, while I was not involved in the earlier round of appeals, I suspect my client's interest in further litigation would have been nil if on remand the margin remained sufficiently high to keep CS Wind within the confines of the order. At the time of the remand order, that just was not clear how that was going to actually play out for the margin calculations themselves. I'm trying to just think of comparable situations where you say, we didn't like the opinion, but we thought we had a 50-50 chance of winning. Now that we realize we've lost under that, we get to question it again, whereas you had the opportunity to question it on rehearing. Again, it was, as a practical perspective, given that you don't want courts issuing advisory opinions if it's not an issue that's going to be of importance to the client, and there's no way to really know that until we get that margin recalculation, not just on the issue where there was a directed remand, but the very open-ended one involving how the financial statements are going to be used, just was not clear to us at that point that we would get quite the dramatic effect on remand that we did, where a 17% margin went to zero, too low to keep CS Wind, the only mandatory respondent in the investigation within the scope of this order. Because of the change of the methodology on the overhead. Both things, working together, obviously had an effect. As you may know, antidumping calculations, being as complex as they are, can be extremely difficult to predict in advance what the effects will be, and particularly where you have at least one issue where there's quite an open-ended remand and Commerce had any number of things it could do on remand with respect to those financial statements. So, this is not a case in which the agency was given multiple bites at the apple and failed to return a supportable result. Rather, the Court of International Trade affirmed Commerce's reliance on packing list data in the first instance before this court remanded with instructions for the agency to recalculate the margins based on alternative data. The weight issue is also of manifest importance to the domestic industry because as it turned out, that 17% margin went to zero on remand. And as a prior... I think I understand this, but tell me, as a result of it going to zero here, CS Wind Vietnam is no longer subject to the antidumping duty order. And if you thought that there was still a problem, what course would you have to pursue to try to impose antidumping duties on them in the future? Well, I... Initiate a new proceeding. You'd have to initiate a whole new case on Vietnam and specifically on CS Wind. As the prior panel stated when it was evaluating Commerce's financial statement calculations, the agency has unique expertise in the administration of the antidumping duty laws. The Tariff Act also charges the agency with weighing the record evidence. Here, given that the agency was never accorded a second chance in this action to consider its determination on the longstanding federal administrative precedent, judicial precedent disfavoring directed remands, we believe that both the Law and the Equities Council consideration of further remand here. I'd also like to briefly address the law of the case doctrine. The lower court opinion and appellee briefs, and thus our reply brief, focused more specifically on the applicability of the mandate rule to the agency in the lower court and stare decisis. These are concepts that are conceptually related to law of the case, but not precisely the same. The Supreme Court has explained in Arizona versus California that the law of the case doctrine is amorphous. It's a judicially created doctrine and most commonly defined deposit that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. The Supreme Court has also explained that law of the case is not a hard stop on judicial power. It exists as a guide to judicial discretion. And to the extent that the present panel views the law... Isn't there a fair bit of law that says the mandate rule as part of the law of the case is pretty darn strict? Yes, but the mandate rule really applies to lower courts and agencies. I did some research on this in preparing for our argument. I could not find a case that said the mandate rule binds the court that issued the mandate. The law of the case doctrine goes more to how the court that issued the mandate should view issues if they come back up on appeal. And again, the Supreme Court says, you know, this is sort of a discretion of the court. Do we want to revisit a prior rule of law that a prior panel has stated in a stage of the case? Here, though, and it's discretionary. There's no hard stop. It's not jurisdictional. There's no absolute bar on the tribunal's power that's established by the law of the case doctrine. And so it's a guide to judicial discretion. And to the extent that the present panel believes the law of the case is relevant here, we're asking the court to exercise its discretion in favor of remand for the reasons I previously mentioned, and with particular emphasis on the fact that the prior panel's determination did not circle solely on the law. It was not one of statutory interpretation or what the regulations mean, but of which record facts were the most persuasive and reliable. I'd now like to turn to the second issue in the case, which is Commerce's determination not to seek clarifying information from Ganges, the company that issued the surrogate financial statement. The financial statement here is not ideally clear with respect to the degree to which various line items include or contain overhead expenses. The agency repeatedly attempted to separate out overhead expenses, only for the lower court and prior panel to profess confusion as to the methodologies that were used and the agency's rationales for adopting them. Mr. Thorson, let me ask you a question. What typically, if you know, is the process, what process does Commerce follow when it requests, when it seeks or wants to use financial information from a third-party surrogate like Ganges here? Does it go to public documents or is there ever any contact as a matter of general course with the third-party surrogate? The agency's general practice, as I understand it, is not to seek information directly from third parties. Generally, it relies on the parties to present surrogate financial statements to the agency. It does not go out and seek such data on its own. Now, that being said, I have seen Commerce in certain cases go out and do its own research on, for example, what a word means in a surrogate financial statement or whether there's any evidence to show that a particular company is really making products similar or identical to the product at issue. Commerce has great discretion, and even though it doesn't have a general practice of seeking third-party data or issuing questionnaires to third parties, it doesn't have a hard stop or anything that precludes it from going out, doing its own research, supplementing their practices. So you're saying initially, though in the initial case here, the information, namely the Gange's financial data, would have come from the parties before Commerce? One of the parties, yes. All the parties would have been given an opportunity to place surrogate data on the record. The parties would have gone out and done research on what companies might exist in potential surrogate countries that make merchandise identical or like the subject merchandise that are publicly available that don't seem to have subsidies in the surrogate financial statements, at least the statements don't obviously show the receipt of countervailable subsidies, and would put those on the record for the agency to then consider a choice among all the financial statements on the record. And this one was in some way a public financial statement issued? Yes. I don't know, like the Indian SEC or something? Indian companies often have publicly available financial statements, and that was one of the reasons that for many years Commerce primarily relied on India as a surrogate for China in non-market economy cases. It was just very easy to get financial statements out of India. Here we have an Indian financial statement that, for better or worse, doesn't have ideal clarity with respect to this line item and how you're going to separate out the overhead expenses in it. The prior panel, again, remanded to the agency to make another attempt at separating out these expenses, and specifically asked the agency to explain whether it viewed itself as somehow precluded from seeking data from Ganges. Right. And as I understand it, Commerce came back and said, no, we're not precluded. We can, but we have generally good reasons, and we're going to rely on them here for not asking because the likelihood of a – without far more work than – without burdensome work, and it's just not worth it. Why is that not a reasonable way to proceed? That might be a reasonable explanation for your general practice of not going out and doing this, but this is a case with extremely unique facts. Commerce has had multiple bites at the apple. This is obviously a confusing issue. They've been working sort of blind with a lot of guesswork as to how to separate out these various parts of overhead from these line items. The prior panel itself said, why not ask? Why not just go try and ask at least? And while Commerce has explained that it's not precluded from seeking data but chooses not to do so, we don't believe that the rationales they're giving are very satisfactory given the unique facts of this case. We're not requesting that Commerce institute a general practice of seeking data from third parties. We've just got extremely unique facts here where everyone has scratched their heads and puzzled over this financial statement multiple times, and information from Ganges, if it were obtained, would be another data point that could clarify all of this confusion and – What's the standard that we use to review this determination? That's a good question. I would say it's very much similar to the normal, have you articulated a satisfactory explanation for your conclusion given the facts? If you haven't, go back and try it again. You can either change your mind and ask them for information, or you can come back to us and give us an explanation that holds water. But you have to have an explanation that makes sense given these unique facts, that isn't just an explanation of why you don't have a general practice of requesting such data. Why does it make sense here? What would the specific burdens be here for issuing a very short questionnaire? And if you didn't get the information, well then, at least you've tried, and you can go forth with the calculations you've got. And if you do get an answer – Can I just ask you one quick question? Did you suggest to Commerce a very targeted, written-out, specific inquiry or number of inquiries that it might make to Ganges? I don't believe that we presented them with a specific, like, here's your letter, please go send it. But the issue here is – Because it's not self-evident to me what the precise question is. Except, you know, how do you do tower setup? Yes, it might be something like that. It might be just, we're having trouble understanding line items 2, 3, and 5. Please tell us to what extent tower setup costs include x and y. This is not a very long letter. It's not a huge, burdensome thing to put together. And as the lower court said, the burden of putting it together and sending it out is likely quite low. And whether you get an answer – If you don't get an answer, okay, you don't get an answer. If you do get one, then you have another data point to consider. And possibly a very persuasive one that could cut out some of this guesswork and lead to more accurate results overall. Do you think that one of the factors in Commerce's decision not to seek an answer is that once they cross a certain line and kind of acknowledge or agree that they need this information, that puts more pressure on them, if they don't get an answer, to then have to undertake further development on their own? No, not necessarily. I think if they asked the question and didn't get an answer, then they would say, we asked, we didn't get an answer. Here's our record. Okay. We've almost exhausted your rebuttal time. We'll restore a couple of minutes, but let's hear from the other side. Thank you, Your Honors. We're running your clock, just so you'll know, at the time that you've asked for. Okay. Your Honors, this court should affirm the decision of the trial court because Commerce followed this court's instructions, specifically with respect to the weight discrepancy issue. This court made very specific instructions directing Commerce to use the factor of production weights in stark contrast to the open-ended remand that it ordered with respect to the financial statement issue. We would respectfully disagree with counsel for appellants that there's no legal authority on this question. And in particular, this court's decision in Banks, which discussed the mandate rule as part of the law of the case doctrine, is applicable. In particular, I note that Banks certainly did not involve purely legal questions. It was a factual matter. It was a case about the jurisdictional facts relating to a statute of limitations issue. And what had originally happened is that this court had made a ruling on the statute of limitations ground. It went back to the trial court. The trial court adduced additional facts at trial that it believed moved the goal posts in terms of the statute of limitations issue. The case came back to the court, and the court said, no, this has been determined by a prior panel of this case. If anything, the law of the case doctrine, when you have a prior panel of this court in the same litigation making a decision, is further preclusive. I'm sorry, further preclusive than, for example, stare decisis. It's the same case. The further legal authority that's applicable here are this court's own rules. Rule 40, which is the rule that governs rehearing, which gives this court an opportunity to look at errors of factor law, as the appellants have alleged. And, of course, Rule 35, which is the en banc review rule, which allows a party to allege that there is a conflict with other decisions. So if that's the issue, appellants should have raised it in that context. Having failed to do so, the mandate rule and the law of the case doctrine, through decisions like banks, kick in. And there isn't a further opportunity, at least before this court, for appellants to challenge the court's prior decision. The decision was clear. Commerce followed it. And it should be affirmed on that basis. Regarding the second issue, with respect to the Ganji's financial statement, Commerce also followed the court's direction in that the court instructed Commerce to provide an explanation about whether it had authority to seek further information. It did so. It confirmed that it does, in theory, have authority to seek information from anyone. It then further provided the explanation as to its practice and why it applied the practice here. To answer a question that your honors raised during Helen's arguments, the process here is very much that Commerce has no contact with these third-party surrogate value companies. The parties to the proceeding, that is, the Wind Tower Trade Coalition and CS Wind, provide financial statements as part of the process of developing the surrogate value information that Commerce uses to value the price of one of these wind towers in the home market. I would direct your honors to the record here in this case, particularly comments two and three of Commerce's issues and decision memorandum. Comment three is probably the most applicable. It's page 5129 of the record. The reason that's interesting is because this is the stage at which the parties have proposed the Ganji's financial statement. They're arguing over how these job work expenses should be treated. No one in that process asked Commerce to start reaching out to Ganji's as a third-party company who has no real involvement in the proceeding. Its only involvement in the proceeding is that it happens to be a company in India that has publicly available financial statements. One of the parties reached out and grabbed those statements and provided it to Commerce as part of this record. Did either of the parties have an opportunity on remand to go out and talk to Ganji's themselves and submit information? I guess one question is, did they have the opportunity? Second, did they do anything like that or what? I think the answer is yes, but it's more than an answer, no questions. There are several parts. One thing I would note, which is slightly different, but I think very much related to your Honor's question, is during the first two remands prior to this Court raising the issue of sua sponte in the previous appeal, no party has suggested to Commerce that Commerce go out and contact Ganji's. They certainly had the opportunity during the comment process on the remand results to say, hey, this is looking complicated, maybe you should contact Ganji's. No one, particularly not WTTC, the appellant now, asked Commerce to do that during the first two remands. So that was certainly an opportunity to do so. The more complicated answer to your question is yes, they certainly could have advocated for Commerce. The way this normally works in trade proceedings is that a party will, as maybe sometimes happens to this Court when someone wants an extra filing or something like that, a party will come to the agency with information that it has obtained and say, we think you ought to reopen the record to include this information. So Commerce did not make a formal decision to reopen the record. It didn't say we're reopening the record and soliciting further information, but nor did a party, as they frequently do, come and say, we've gone and gotten information you should have. As a general matter, I think that's a rarity. It's very, very much the rarity that in this type of context, where you have Commerce's by regulation relying on publicly available information, and I'll provide the regulation. That may be something that was kind of lost in the briefing. 19 CFR 351-408C, that's Commerce's regulation on surrogate values, and it specifically states a regulatory preference for relying on publicly information, not private information being solicited from a party. So I'm not familiar, and I would assert that it would be extremely rare for Commerce to go out in this type of financial statement context and try to contact a third-party company to get more information. The times Commerce has done anything like that have been different. But on top of that, in other instances, for example, I'm aware that in the next proceeding of this review, parties have gone out and gotten further surrogate value information from the sources that they supplied it and put it on the record and told Commerce, this organization that we've gotten metal data from has verified it. How many administrative proceedings have there been since? Is there just one or two? And what's the role of CS Wind in there? If we affirm here, do they get to say, see you later? CS Wind has been provisionally excluded from ongoing proceedings pending the results. One administrative review was completed. That case was in litigation at the time this court decided the first or shortly thereafter. So it stayed pending the results of the decision here. At State and Commerce or in CIT? State and CIT. It's a slightly complicated story. There were two reviews. The second and third review were rescinded because there were no shipments. The fourth review was recently completed. CS Wind was provisionally excluded from that review. I think the time to appeal has expired. They are also provisionally excluded from the fifth review, which has just started. So the way it works is that they're provisionally excluded in the lesson until something different happens. And if this is affirmed, they will be permanently excluded. One other issue to note is that this court's precedent is that under cases like QBD Foods, which we cited in our brief, it's a party's responsibility to create. The parties before Commerce have the burden to create a record before the agency. So whatever the agency might do in terms of striking out on its own, it's really ultimately up to the parties. It's not the agency's responsibility. The agency further here, I think, made clear that it's not just a matter of potentially not getting a response at all. But as Your Honor articulated its reasoning earlier, it's about getting a useful response and the likelihood of that. Turning essentially these surrogate value calculations that it's required to do in every non-market economy case into effectively a mini-investigation into the surrogate value company and what might be behind its public financial statements. And for that reason, as the trial court agreed with Commerce, it's a matter of the potential burden and the fruitfulness of engaging in these type of inquiries, not justifying the cost of attempting to do so. It's an abuse of a discretion standard in this case. There's no governing rule. Hence, it's a matter of Commerce's discretion. And these types of record inquiries, the court has typically treated as matters of agency discretion. And therefore, the standard review is abuse of discretion. Here, Commerce did not abuse its discretion and followed the court's instructions. And therefore, the trial court's judgment should be affirmed. Thank you. Thank you. Good morning. I'm Ned Marshak of CS Wind. I'd like to start by answering Judge Taranto's question on the opportunity of response to petitioners on reband to go to Ganges. We had that opportunity to ask Commerce to go to Ganges throughout this proceeding before the Department of Commerce originally. Nobody asked. Nobody asked on the remand. When the court brought this issue up itself in its decision, we had a drafted redetermination by the Department of Commerce. And that draft redetermination, we had the opportunity and petitioners had the opportunity to ask the Department of Commerce, why don't you go and ask Ganges for these particular reasons that are unique to this particular case? As I understood Mr. Curlin's answer, you also had the opportunity to say, please reopen the record. We we talked to Ganges. Here's a, you know, a sworn declaration saying we do all of our tower set up by outsourcing contracting or something. On what happens on the remand, the Department of Commerce issues a draft redetermination. And in the draft redetermination, what Commerce said this time was they recalculated the financial ratios in their draft redetermination. In a way, for the first time, it was favorable to us. And they said they're not going to go out and get more information from Ganges for reasons which we think are very important and correct reasons that it would be unsuited for their administrative process to open that up. So the draft redetermination comes out that when the parties comment, the parties have the opportunity to comment. And in those comments, the parties could say there's something wrong with the calculation methodology or in this particular case, you should have asked Ganges for these reasons and or we asked Ganges and here's additional information. So the opportunity is there in the draft remand determination. In the draft redetermination in this case, we filed comments saying your draft remand is better substantively than your decision before. We wanted to tweak it because we thought there were mistakes and we thought it could be even more precise. Petitioner, however, did not do that. Petitioner, all they did was say Commerce, you made a mistake because generally you should have asked Ganges something. But they didn't say that generally had any impact on this particular case. So at that point, petitioners had the opportunity to say that the Commerce's redetermination was not supported by substantial evidence. They didn't do that. And we believe that once they didn't do that, the case is over. But what they also didn't do is they didn't link the reason to go to Ganges to this case. They just kept it generally. So they can't say that there's a problem with this particular case because they've lost that opportunity. So we have to look down. Generally, should Commerce go look behind financial statements? They didn't do the requisite link. They can't come in here now and say we should have done it because this case was difficult. They had the opportunity to say that and they blew it. But generally, when you look at Commerce's general policies, why they don't go to look behind financial statements, we believe that Commerce did a very good job of articulating that policy. The decision and the CIT affirmed in the policy makes a lot of sense because when Commerce has one of these cases, they are very, very complicated to look behind the financial statement. A public financial statement that's placed on the record is going to really start a whole new proceeding. And it goes to Commerce's administrative resources, the allocation, the investigative and enforcement resources of Commerce. That's what's at stake here. If you have to go through and look at financial statements, it's a whole new level of analysis. Commerce doesn't want to go there. They already have too much to do. And we believe that this is an abuse of discretion standard that you have to look at here. And Commerce did not abuse discretion. And it's a very, very high standard, as in the Tarrington case. And Commerce absolutely met that standard generally when they said we're not looking behind financial statements. And in particular, petitioners didn't even raise it. Your time has expired. Thank you. Please. Your honors, with respect to the banks case, my understanding is that in banks, this court was reacting to a Court of Federal Claims decision that went beyond the court's mandate. So the case did not really get into, is this court bound by its own mandates? It was focusing, like many of the cases that involve the mandate rule on the lower court or the agency's responsibility vis-a-vis the mandate. But in banks, did this court, having concluded that the Court of Federal Claims was required to follow the earlier mandate, to have a whole separate second section of the opinion that says we're not really bound or so bound by our earlier decision, we will now reconsider it or something like that? I don't think that issue was raised in banks at all. It was really did the lower court exceed the bounds of the mandate? Can we now also exceed the bounds of the mandate or should we reconsider ourselves this original determination? It was focused, as my understanding is, on what the lower court was required to do. There's also an interesting question about what a mandate is. A mandate really just transfers jurisdiction back to the lower court. So the mandate does not itself, by virtue of being the mandate, somehow bind this court. The issuance of a mandate does not, by the fact that there's a mandate that exists, bind this court in perpetuity to a particular determination. It merely transfers jurisdiction back. With respect to the issues on the Ganges financial statements, the question posed by the court was not, did the parties have the opportunity? Why didn't the parties do X? But Commerce, why didn't you do X? Explain to us why you didn't do X. And they have not yet done that adequately. And frankly, I'm a bit confused by Mr. Marshak's claim that we didn't raise the question in our remand comments to the agency, on you should go get information from Ganges. And you can find that beginning at 5272 of the appendix, if you're interested. So with that, I'll conclude my presentation. Thank you. We thank both sides. The case is submitted. We're going to take a brief recess at this point, and the next case can start setting out. Thank you.